NOT FOR PUBLICATION

FILED

Jan. 13 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   NV-12-1596-JuKiKu |
| GO GLOBAL, INC., et al., | Bk. Nos.  10-14804-BAM |
| | 10-14456-BAM |
| Debtors. | 11-27226-BAM |
| | (jointly administered) |
| HUGO R. PAULSON; AZURE SEAS, LLC; AZURE SEAS HOLDINGS, LLC; THE LODGE, LLC; YOUGO, LLC; CHARLES ANTHONY ORCHARD, LLC, | Adv. No.   10-01334-BAM |
| Appellants, | |
| v. | M E M O R A N D U M* |
| GO GLOBAL, INC.; CARLOS A. HUERTA; CHRISTINE H. HUERTA; CHARLESTON FALLS, LLC, | |
| Appellees. | |

Argued and Submitted on November 22, 2013
at Pasadena, California

Filed - January 13, 2014

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce A. Markell, Bankruptcy Judge, Presiding

Appearances:     John J. Egbert, Esq., of Jennings, Strouss & Salmon, P.L.C., argued for appellants Hugo R. Paulson, Azure Seas, LLC, Azure Seas Holdings, LLC, Yougo, LLC, The Lodge, LLC, and Charles Anthony Orchard, LLC; Mark G. Simons, Esq., of Robison, Belaustegui, Sharp & Low, argued for appellees Go Global, Inc., Carlos A. Huerta, and Charleston Falls, LLC.

_____
     * This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Before:  JURY, KIRSCHER, and KURTZ, Bankruptcy Judges.

Appellants, Hugo R. Paulson (Paulson), Azure Seas, LLC (Azure), Azure Seas Holdings, LLC (Azure Holdings), The Lodge, LLC (Lodge), YouGo, LLC (YouGo), and Charles Anthony Orchard, LLC (CAO) (collectively, Appellants), appeal from the bankruptcy court's judgment in the amount of $5,579,656.71[1] in favor of appellees, Go Global, Inc. (Go Global), Carlos A. Huerta (Huerta), and Charleston Falls, LLC (Falls) (collectively, Appellees).  We AFFIRM.

## I.  FACTS[2]

Huerta, through his business entity, Go Global, was a real estate developer.  Huerta holds 100% interest in Go Global and Go Global holds 79% interest in Falls.  Appellees are chapter 11[3] debtors in the underlying jointly administered bankruptcy case.

Paulson holds 100% of the interests in Azure, Azure Holdings, Lodge, YouGo, and CAO.  Appellants each filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Arizona on November 16, 2012, after

---

[1] Plus prejudgment interest on $2,604,478 calculated from March 9, 2010.

[2] The undisputed facts are mostly taken from the bankruptcy court's Memorandum Decision entered on November 2, 2012.

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

the judgment was entered in this case.

**A.    Summary of the Dispute**

Since 2002, Paulson, individually or through his various business entities, invested with Huerta on real estate development projects or worked with Huerta brokering real estate developments or provided financing for third-parties with whom Huerta was also associated.  In 2009 the parties had a falling out.  Thereafter, Paulson took steps to disassociate himself from Huerta on three of their existing projects which are described below.

**1.    Mt. Charleston View, LLC**

The main dispute among the parties centers on the Mt. Charleston project that was located on Mt. Charleston, a short drive from Las Vegas (Property).  The Property consisted of a restaurant/bar and banquet facility, two cell towers, some cabins near the lodge, two custom homes and four custom lots.

In 2005 Huerta created an entity called Mt. Charleston View, LLC (View) to own the project and named himself and a third party, Barbara Orcutt (Orcutt), as managers.

In April 2006, View purchased the Property from C-Bar Corporation (C-Bar), an Orcutt entity, for the amount of approximately $2.9 million.  At that time, Huerta held 80% interest in View and Orcutt held the remaining 20%.

On May 31, 2006, Orcutt assigned her 20% interest in View to Huerta for which Huerta purportedly paid $3 million. Concurrently with the transfer of title, the escrow company issued a $1 million check to Sierra Agency, LLC (Sierra). Sierra was owned by Daniel DeArmas, then an employee of Huerta.

-3-

The source of the funds to cover this check was the purchase price for the Property, funded primarily by Huerta's $3 million investment. DeArmas negotiated the check to Go Global, which issued invoices to Sierra to minimize or eliminate taxes on the receipt. Go Global ultimately paid tax on this amount as ordinary income.

Paulson eventually invested $5 million in the Property through his investment vehicle Azure. Huerta then restructured the membership interests so that Paulson held his interest in View through Azure and Huerta held his interest in View through Falls. Azure owned 65.6577% of the membership interests, based on Paulson's investment of $5,000,000, and Falls owned the remaining 34.3423%, based upon an agreed investment of $2,615,258.73.

In 2006, Paulson and Huerta through their respective entities, Azure and Falls, executed an operating agreement for View (View Operating Agreement). Through the View Operating Agreement, the parties removed Orcutt as manager and named Go Global (wholly owned by Huerta) and Paulson as managers. The View Operating Agreement was not a model of clarity or consistency. The bankruptcy court later found at trial that the provisions relating to the authorization of the managers to act on behalf of View were "hopelessly ambiguous." Article X, entitled "Management," states that "each member shall have an equal voice in the management of the Company." Article X(B) states that "[e]ach of the managers has authority to bind the Company . . . and . . .[t]he Managers' power(s) will not be limited in any fashion whatsoever . . . ."

-4-

Orcutt's exit from View presented an operational problem because the Property sold liquor and sponsored gambling activities, which needed special licensing. Orcutt had qualified for this licensing. Initially, Orcutt stayed on to manage the restaurant and gaming activities, but after about a year, Huerta and Paulson decided to take back the restaurant and gaming operations from Orcutt.

To operate the gaming and restaurant facilities at the lodge, Huerta formed a separate company called Mountain Gaming, LLC (Gaming) which was 100% owned and controlled by Huerta/Go Global. Huerta agreed that Paulson would become a 50% member in Gaming. Neither party invested any cash or other property, other than the time and effort necessary to obtain the required licensing.

On January 9, 2008, Huerta and Paulson executed an operating agreement for Gaming, pursuant to which each individual became manager of and 50% interest holder in the company (Gaming Operating Agreement). Gaming acquired the Property's gaming licenses and took over its operations from Orcutt in 2008. Gaming made significant profits which were used to pay Gaming's expenses, as well as some of View's expenses.

In September 2008, after a month in which Gaming earned some $84,000 in profits, Huerta caused Gaming to distribute $15,000 in excess profits each to Paulson and Huerta. Around this time, Paulson began to assert that his ownership in Gaming mirrored his ownership in View and that, as a two-thirds owner, he must consent to any major actions. Paulson also expressed his view that Gaming was never intended to produce profits for

Huerta and Paulson, but was to be used as a source of funding for View's short and long term needs.

In 2008, Huerta's and Go Global's prior business plan no longer worked due to the economy. Huerta began to have cash flow problems.

In April or May 2008, Paulson loaned $950,000 for Huerta's benefit. The loan was actually made to Huerta's father-in-law, with the promissory note guaranteed by Huerta and Go Global. The bankruptcy court found that there was no doubt the vast majority of the proceeds went to Huerta's and Go Global's benefit.

By early 2009, Paulson and Huerta had a falling out with respect to the direction of the Mt. Charleston project. Paulson wanted to turn the Property into a high-end resort while Huerta wanted to sell the Property to raise much needed cash. Paulson wanted Gaming's profits transferred to View for View's use and Huerta wanted them distributed to him and to Paulson in equal shares.

In February 2009, Paulson sought to buy out Huerta's investment in View for $2,615,258 plus a premium. When Huerta asked to also be bought out of Gaming, Paulson balked and refused to pay anything for Gaming. Paulson thought Gaming only had value in light of View and that he controlled View by virtue of his 66% interest in that entity.

Not surprisingly, Huerta rejected the offer even though he was in significant financial straits. After this rejection, Paulson sent an email to Huerta and DeArmas (who was in charge of Gaming's day-to-day operations at that time) forbidding any

-6-

distribution of profits or revenues to Huerta until the ownership issue was resolved. In turn, Huerta affirmatively asserted his 50% interest in Gaming in an email dated April 21, 2009.

But by this time, Paulson began to take steps to dissociate himself from Huerta for reasons extending beyond the dispute over the Mt. Charleston project. Paulson did not inform Huerta of his long term intent, instead assembling a team of professionals with the intent of divesting Huerta from the Property at the lowest cost possible. Paulson, through his attorney, sent a letter to Huerta accusing him of criminal misconduct and demanding $5,469,008 to settle all disputes. When there was no response, Paulson sent an email to his team elaborating on this criminal theme, asserting his opinion that Huerta would walk away rather than fight the criminal charges.[4]

Huerta made several proposals to settle the disputes between Paulson and himself, all of which were rejected.

The $950,000 loan from Paulson to Huerta's father-in-law came due in November 2009. Huerta did not pay it or cause it to be paid. Paulson took Huerta's default as a further insult and ongoing justification for his efforts to disassociate himself from Huerta.

In December 2009, Paulson formed YouGo to take over operations from Gaming.

In January 2010, Paulson emailed his team of professionals to indicate that the takeover should start as of February 15,

---

[4] Huerta was never charged with any crime.

-7-

2010. Paulson also began to develop theories to deduct $1 million from any price paid to Huerta because of the April 2006 payment by Orcutt to, ultimately, Go Global. The bankruptcy court found that "[m]otivating this was, in Paulson's own words, his desire not to put any money into Huerta's 'slimy paw.'"

According to the bankruptcy court, Paulson took these steps in secret and went so far as to categorize his efforts as a "blitzkrieg;" an effort to surprise and defeat Huerta quickly and without any chance for Huerta to defend himself.

On January 28, 2010, Paulson executed a formal lease between Gaming and View. He signed in his capacity as a manager of View and as a manager of Gaming. This document formalized Gaming's right to occupy the Property. It also stated that Gaming's rights would terminate upon "the creation of a right to occupy the Property in YouGo, LLC, pursuant to that certain Lease Agreement by and between Lessor, View, and YouGo, LLC, and dated on or around the date hereof. . . ."

On February 12, 2010, Paulson formed Lodge with the purpose of having it take over all of View's assets, including the Property.

On February 27, 2010, Paulson signed an Agreement and Plan of Merger under which Lodge merged with View, with Lodge as the surviving entity. Under the Agreement and Plan of Merger, Falls' interest in View would be converted into a right to receive $10.

On March 5, 2010, Paulson filed the Articles of Merger with the Nevada Secretary of State. The bankruptcy court found that

Paulson did not inform or consult with Huerta about the merger.

On March 9, 2010, Paulson's attorney sent a letter to Huerta's attorneys about the merger and tendered the $10 merger consideration.[5] In its findings, the bankruptcy court observed that the merger was not particularly "clean." Huerta remained liable as a guarantor on View's $1.9 million loan from Nevada Bank and was not relieved of that liability until Paulson effected a refinancing of that loan in July 2010. YouGo was not appropriately licensed for the Property's operations until August 2010, and Paulson operated the Property through Gaming until September 2010. Finally, the court found that upon taking control of the Property, Paulson took $316,589.63 from View's and Gaming's bank accounts for his own personal use.

On April 12, 2010, Paulson formed CAO so that he could transfer to it the two custom houses and the four built-out lots from the Lodge. The bankruptcy court found that Paulson did this to place "roadblocks" in any effort by Huerta to seek

[5] The letter indicated that Paulson determined, based on an appraisal and other information, that the liabilities of View exceeded the value of its assets and therefore the interests of the members in View had a negative value. Despite the negative value, the "Merger Consideration" for View was determined to be ten dollars. The bankruptcy court's findings tell a different story. The bankruptcy court stated that Paulson and his professionals determined that the value of View before the merger was $782,000. Based on the 34/66 allocation of ownership interest in View, that would have meant that Falls' interest in View before the merger was $258,050.00. Paulson determined however that Falls' interest in View had been diluted by the $1 million kickback to Go Global during the purchase of View from C-Bar. Thus, at the time of the merger, Paulson calculated that Falls owed Azure money, and the ten dollar payment from Lodge to Falls was intended as nominal consideration.

-9-

redress for the squeeze-out merger.

### 2. McCarran Development, LLC

Paulson, Huerta and a third party, Michael Barnes (Barnes), formed McCarran Development, LLC (MCD) with the intention of having MCD acquire and develop 13 acres near Reno, Nevada. Each party invested $10,000, with ownership to be 40% in Paulson and his affiliate, 30% to Huerta and 30% to Barnes. The plan behind MCD was that Paulson would contribute the 13 acres after which the parties would work together to obtain entitlements to develop and then sell to a developer. Despite these plans, the parties never signed any agreement to convey the property to MCD.

In an August 27, 2009 email, Paulson asked Barnes to take over the business from MCD because another managing member, Summer Rellamas, was leaving. In a May 31, 2011 deposition, Barnes testified that he wanted to discuss his taking over as the managing member with Huerta "so as not to blind side him." Two days later, after receiving another email from Paulson, Barnes agreed to take over as the managing member but told Paulson that he wanted to call Huerta. Barnes also asked Paulson if there was an operating agreement. On Friday, August 28, 2009, Paulson sent another email which told Barnes that he did not have a copy of the operating agreement and "so far as I'm concerned, creating an operating agreement or articles may be important only in that it would provide a method of dissolution. If [Huerta] was to create a problem in accomplishing that, that's up to him." Finally, Barnes testified that in late August 2009 he had figured out that he

-10-

was coming in as the managing member of MCD for the sole purpose of dissolving it.

On October 7, 2009, Barnes sent an email to Paulson and Huerta regarding the dissolution of MCD. Barnes wrote: "Recent discussions with all Members within McCarran Development, LLC resulted in an unanimous decision to dissolve the entity." The email further stated that the company's assets totaled $14,503.94 and indicated that each member would receive its pro rata share based on membership interest. However, the bankruptcy court found that Huerta never agreed to dissolve MCD.

In its findings, the bankruptcy court noted that "Paulson dissolved MCD soon after he sued Huerta in the [Waterstone] Action.[6] Paulson took these actions without informing Huerta, and without Huerta's consent." Ultimately, the bankruptcy court found Paulson's dissolution of MCD was a fraudulent transfer based on his breach of the fiduciary duty of loyalty to Go Global and awarded Go Global judgment in the amount of $10,000, which it offset against the judgment awarded in favor of Paulson in the Waterstone Action.

### 3. Pecan Street Plaza, LLC

Before the problems at View, Paulson and Huerta had also invested in a 15 acre parcel located in Pflugerville, Texas known as Pecan Street Plaza, LLC (PSP). The investment was with other people and Paulson desired to buy them out. In a transaction in which PSP accomplished this, it also acquired an

---

[6] The bankruptcy court refers to the Waterstone Action as the "Prior Action." This lawsuit is further described below.

-11-

additional 22 acres in a transfer arranged by Huerta and Go Global. As a result of the transfer, Go Global was given a 15.87% ownership interest in PSP. In order to reflect the parties' deal, however, Go Global simultaneously encumbered its interest in favor of Paulson to secure a $700,000 "loan" made by Paulson. However, no funds were ever transferred; the loan was to ensure that any proceeds from sale or refinancing would go first to Paulson or his interests, and then when those had received a priority return, the remainder would be split in accordance with the ownership interests of record.

The bankruptcy court determined that the transaction was highly convoluted, and the parties' efforts to explain it at trial were unavailing. The court found that what was uncontroverted, however, was that Paulson removed Huerta from PSP's management as part of the "blitzkrieg," and subsequently caused capital calls to be made at a time when Paulson knew that neither Go Global nor Huerta had the resources to pay. The court found that the intended result was that Go Global's interests would be diluted if Paulson paid Huerta's and Go Global's share.

**B.   Paulson's Allegations And Lawsuits Against Huerta**

**1.   The Waterstone Action**

As a reason to dissociate himself from Huerta, Paulson alleged that Huerta failed to disclose relevant facts in another real estate investment deal the parties developed through HC Waterstone, LLC (HC Waterstone). Huerta and Paulson contributed $6.5 million to HC Waterstone, which was an investment vehicle designed to lend money to Waterstone Attached

-12-

Homes, LLC. In connection with his contribution, Huerta borrowed one million from an entity controlled by Paulson. The plan was to turn around their investment in eighteen months. However, the condominiums did not sell and the property went into financial distress. Eventually, it was sold to a new entity owned by John and Madonna Beal (Beal Transaction).

The distribution from the Beal Transaction was $3.9 million with $2 million distributed with adjustments for the payoff of the remainder of the one million loan owed to Paulson by Huerta. The remaining $1.9 million was distributed to Go Global, characterized as an undocumented short-term loan. Go Global did not repay this short-term loan to Paulson.

On June 19, 2009, Paulson filed a lawsuit against Huerta entitled <u>Hugo R. Paulson, individually and as Trustee of the</u> <u>Hugo R. Paulson SEP IRA v. Carlos Huerta and Go Global, Inc.</u> in the Second Judicial District Court, County of Washoe, Nevada, alleging that Huerta had defrauded him of $4.5 million in connection with this investment. This action was subsequently removed to the bankruptcy court and is further described below.

**2. Copper Canyon Development, LLC**

Paulson also alleged that Huerta failed to disclose vital information with respect to the Copper Canyon Development, LLC (Copper Canyon), an entity owned and managed by Huerta and Barnes, which was the first real estate deal on which Paulson worked with Huerta starting in 2002. According to Paulson, Huerta acted as his licensed real estate broker and assisted him in the sale of 1,300 acres of real property near Sparks, Nevada, to Copper Canyon for $23 million. Paulson paid Huerta a

-13-

$2 million commission for the sale of the property.  In 2009, Paulson allegedly learned that Huerta sold the property for $35.7 million and failed to disclose to Paulson the $12.7 million profit that he and Barnes made on the re-sale of Copper Canyon.

### 3.    The Savino Lawsuit

When Huerta did not pay Paulson on the $950,000 loan that benefitted Huerta and Go Global, Paulson sued Huerta and Huerta's father-in-law, Anthony Savino, in the Eighth Judicial District Court, County of Clark, Nevada entitled <u>Paulson et al. v. Anthony Savino</u>.

**C.    Bankruptcy Events**

Largely due to the actions of Paulson, on March 18, 2010, Huerta and his wife Christine filed a chapter 13 petition (Case No. 10-14456).

Five days later, on March 23, 2010, Go Global filed its voluntary chapter 11 petition (Case No. 10-14804).

On April 5, 2010, the bankruptcy court entered an order granting the joint administration of Huerta's and Go Global's bankruptcy cases.

On April 9, 2010, the bankruptcy court converted Huerta's case to chapter 11.

On October 31, 2011, Falls filed its voluntary chapter 11 petition (Case No. 11-27266).

On December 9, 2011, the bankruptcy court entered an order granting the joint administration of Huerta's, Go Global's and Falls' bankruptcy cases.

**1. The Waterstone Action and Nondischarageability Complaint**

After Huerta and Go Global filed their petitions, Paulson removed the Waterstone Action to the bankruptcy court (Adv. No. 10-01207). Paulson alleged claims against Huerta for fraud, conversion, declaratory judgment, breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. In the Waterstone Action, Paulson sought recovery from Huerta in connection with Paulson's investments in HC Waterstone.

Paulson contended that the debt due to him from Huerta in the Waterstone Action should be excepted from discharge under § 523(a)(2)(A), (4) and (6). Therefore, on July 19, 2010, Paulson filed a separate action against Huerta and Christine Huerta objecting to the dischargeability of the debt arising out of the Waterstone Action (Adv. No. 10-01286).

On September 13, 2010, the bankruptcy court granted Paulson's motion to consolidate the two adversary proceedings for trial.

On April 27, 2011, the two adversary proceedings were tried together.

On August 31, 2011, the bankruptcy court issued its Findings of Fact and Conclusion of Law (FFCL). In the Waterstone Action, the court found that Go Global owed $1,023,076.85 to Paulson for the undocumented short-term loan. The court further found that Paulson's contentions and testimony that Huerta had defrauded him were "not credible" or "believable." The court concluded that Paulson failed to prove

-15-

all his other claims against Huerta.  In the nondischargeability action, the bankruptcy court found that Paulson failed to prove his claims against Huerta under § 523(a)(2), (4) or (6).  The court entered judgment in accordance with its ruling on August 31, 2011.[7]

### 2.    The Instant Adversary Proceeding

On September 3, 2010, Huerta and Go Global commenced this adversary proceeding against Paulson, Azure and Azure Holdings (Adv. No. 10-01334).

On August 29, 2011, Huerta and Go Global filed a first amended complaint (FAC) adding Lodge, YouGo and CAO as defendants.  The initial and amended complaints sought monetary recovery for transfers made involving View, PSP, and MCD under theories that the transfers were either preferences under § 547 and or fraudulent transfers under § 548 and under state law. The FAC also asserted state law claims under § 544.

On August 31, 2011, Appellants filed their answer and counterclaim.  In the counterclaim, Appellants sought declaratory relief concerning the ownership of cabins located on the Property purchased with funds allegedly belonging

---

[7] Just prior to the bankruptcy court's decision, Paulson filed a complaint with the Nevada Department of Business and Industry, Real Estate Division ("NRED" Complaint), alleging that Huerta had defrauded him in 2005 regarding the Copper Canyon project.  The NRED Complaint also stated that Huerta had embezzled money from him in the Waterstone investment even though Paulson acknowledged that he was reporting Huerta's actions after the statute of limitations had expired.  On January 3, 2012, the Nevada Department of Business and Industry determined that there was insufficient evidence to substantiate any violations alleged and thus the investigation was completed.

-16-

to View.  Appellants alleged that Huerta and Go Global held the deeds to certain cabins and claimed the cabins as assets on their bankruptcy schedules, but in reality the cabins belonged to View.  Appellants also sought injunctive relief enjoining Huerta and Go Global from including the cabins as assets in their estates.

### a.    The Parties' Motions for Summary Judgment

On September 7, 2011, Huerta and Go Global filed a motion for summary judgment (MSJ).  In the MSJ, Huerta and Go Global sought partial summary judgment on the issue of liability pursuant to the claims alleged in the FAC.  Moreover, the MSJ sought relief and recovery from Paulson based on nonbankruptcy claims, including statutory and common law claims under Nevada law, among them Paulson's breach of fiduciary duties owed to Appellees.  The MSJ couched the state law claims as recovery actions under § 544.

On December 14, 2011, the bankruptcy court denied this motion.

On September 30, 2011, Appellants filed a motion for partial summary judgment (MPSJ) seeking to dismiss the claims for relief brought by Huerta and Go Global on the grounds that they did not have standing to bring claims on behalf of Falls and Gaming against Appellants.

On March 8, 2012, the bankruptcy court granted Appellants' MPSJ finding that Huerta and Go Global lacked standing to bring claims under §§ 544, 547, 548 and 550(a) against Appellants.

After several rounds of pleadings, Huerta and Go Global corrected the standing issue by having Falls file its own

-17-

bankruptcy petition, followed by the bankruptcy court's approval of Falls' joinder as a plaintiff in the adversary proceeding.

### b.    Appellees' District Court Action

Evidently concerned about the bankruptcy court's jurisdiction to enter a final judgment on the issues raised in the adversary proceeding, Appellees filed a complaint in the United States District Court in the District of Nevada on January 12, 2012.  In this complaint, Appellees alleged claims for relief for breach of contract, contractual breach of the implied covenant of good faith and fair dealing, tortious breach of the implied covenant of good faith and fair dealing, rescission, breach of fiduciary duties, conversion, preemptive taking, bad faith filings, violation of View's operating agreement, fraudulent transfer, constructive fraud, and constructive trust.  As indicated below, this lawsuit was eventually dismissed after the parties consented to entry of a final judgment by the bankruptcy court.

### c.    The Parties' Trial Statements

On February 12, 2012, Appellees filed their trial statement in the bankruptcy court.  In their statement, Appellees argued that they could avoid the View/Lodge merger and Gaming/YouGo merger under § 544(b)(1).[8]  Appellees also advanced theories that they could recover against Paulson under § 544(b)(1) on the grounds that he violated Nevada statutory law

---

[8] Section 544(b)(1) provides in relevant part that "the trustee may avoid any transfer of an interest of debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."

-18-

pertaining to limited liability companies and also breached his fiduciary duties to Appellees. In support of their breach of fiduciary duty argument, Appellees cited Nevada case law which addressed fiduciary duties between business partners. Under this case law, Appellees maintained that Paulson's intentional acts in divesting Appellees from their interests in View, Gaming, MCD and PSP were a clear breach of Paulson's fiduciary duties. Appellees concluded their argument by stating that Paulson was liable for all damages under their § 544(b)(1) claims. At no time did Plaintiffs amend their FAC to add stand-alone claims under Nevada statutory or common law.

On February 13, 2012, Appellants filed their trial statement. They contended that no transfers occurred within the meaning of §§ 544, 547, 548 and 550(a) and further argued that View's Operating Agreement gave Paulson authority to undertake the merger. Finally, they asserted that Appellees' claims regarding MCD were precluded by the statute of frauds because there was no agreement in writing which required Paulson to transfer the 13 acres to MCD. Appellants did not address Appellees' arguments regarding Paulson's breach of fiduciary duties or other violations of Nevada law, but this is not surprising since the parties trial statements were filed within one day of each other.

### d. Appellees' Bench Brief on Damages

On March 9, 2012, Appellees submitted a bench brief on consequential and punitive damages. The consequential damages were awardable under the state law claims, not the bankruptcy recovery claims. Appellees relied upon Nevada law for the

-19-

imposition of punitive damages, including Nev. Rev. Stat. (NRS) 40.005. In citing NRS 40.005(1), Appellees noted that the statute imposed limitations on an award of punitive damages.

### e. The Parties' Consent to Entry of Final Judgment

On March 12, 2012, the bankruptcy court issued an order regarding briefing on whether the parties had consented to the entry of a final judgment in the proceedings by the bankruptcy court. On the record at trial, the bankruptcy court obtained the parties' oral consent to the bankruptcy court's entry of a final judgment on the issues. Both parties had evidently orally consented to the bankruptcy court's entry of a final judgment on all claims prior to this point in time because Appellees dismissed the district court complaint on March 1, 2012.

### f. The Trial

The bankruptcy court conducted a trial in the adversary proceeding and heard testimony over six days, on March 13, 14, 16, 23, 30, and on April 4, 2012.[9] In addition to the testimony, the bankruptcy court also indicated that it would consider matters from the Waterstone Action, including the credibility of the parties and witnesses.

### g. The Parties' Post-Trial Briefs

On April 30, 2012, Appellees submitted a post-trial brief. In their brief, Appellees pointed out that Paulson had admitted during trial that he understood he owed fiduciary duties to Huerta as a co-member and manager of Gaming, to

---

[9] The record contains partial transcripts for these dates.

-20-

Go Global as a co-member and majority manager of MCD and PSP and to Falls as a co-member and managing member of View. They further noted that Paulson testified that he believed as of December 2009 that he still owed fiduciary responsibilities to Huerta, but did not consider telling Huerta that he had created and was implementing his "blitzkrieg" plan to divest Huerta of all interests in View, Gaming, MCD and PSP.

Appellees' brief also contained arguments pertaining to Paulson's violation of Nevada's LLC statutes and his breach of fiduciary duties. Finally, Appellees reiterated that the evidence clearly supported an award of punitive damages against Paulson due to his intentional, malicious and egregious conduct. In so doing, Appellees referenced their previously filed Bench Brief on damages and also cited Clark v. Lubritz, 944 P.2d 861, 867 (Nev. 1997) which held that "the breach of fiduciary duty arising from the partnership agreement is a separate tort upon which punitive damages may be based."

On the same day, Appellants submitted their post-trial brief, responding to the allegations relating to Paulson's violations of Nevada's LLC statutes; specifically, NRS 86.326(4), 92A.150, and 225.084(1). They raised no objection to the bankruptcy court's jurisdiction to decide these claims. They further argued that Appellees were not entitled to an award of punitive damages based on NRS 225.084 for the alleged wrongful filing of the merger documents with the Secretary of

State.[10]  Appellants did not specifically address Appellees' arguments regarding Paulson's alleged breach of fiduciary duties.

### h.    The Bankruptcy Court's Ruling

On May 3, 2012, the bankruptcy court heard closing arguments and took the matter under submission.

On November 2, 2012, the bankruptcy court entered its detailed FFCL.  With respect to the View/Lodge merger, the court denied Appellees' preference claims under § 547 and fraudulent transfer claims under §§ 544 and 548.  The court also denied Appellants' counterclaims for declaratory and injunctive relief with respect to the cabins.

In the FFCL, the bankruptcy court found that "Paulson did not object" to the evidence presented in support of Appellees' assertion that Paulson breached his fiduciary duty.  The court also observed that the parties had "extensively briefed" the state law issues in their pretrial and post-trial memoranda and thus there was "no prejudice" to Appellants in trying the matters.  As a result, the bankruptcy court deemed the FAC amended under Civil Rule 15(b)(2)[11] to include the state law

[10] In their post-trial brief, Appellants incorrectly stated that the "sole basis" for Appellees' claim for punitive damages and an award of attorney's fees and costs was NRS 225.084. Therefore, they did not mention NRS 40.005.

[11] Civil Rule 15(b), incorporated by 7015, entitled "Amendments During and After Trial" provides:

(1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the

(continued...)

-22-

claims for Paulson's violation of Nevada's LLC statutes and breach of his fiduciary duties to Appellees. The bankruptcy court also relied on Civil Rule 54(c) to grant Appellees relief on the various state law claims.

On the breach of fiduciary duty claims, the bankruptcy court found that Paulson's takeover scheme violated his fiduciary duty of loyalty to Falls and Huerta. The court awarded Falls and Huerta compensatory damages of $2,604,478, punitive damages in the same amount, attorneys' fees in the amount of $360,700.71,[12] and prejudgment interest on part of the damages.

The court also found Paulson's dissolution of MCD was a fraudulent transfer based on his breach of the fiduciary of duty of loyalty to Go Global and awarded Go Global judgment in the

[11](...continued)
pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) For Issues Tried by Consent. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

[12] The amount of the attorneys' fees was based on three fee applications filed by Huerta's primary litigation firm, Robison, Belaustegui, Sharp & Low. The bankruptcy court noted that these fee applications were noticed and that Paulson did not object.

amount of $10,000, which it offset against the judgment entered in favor of Paulson in the Waterstone Action.

On the same date, the bankruptcy court entered the Judgment. Appellants filed a timely notice of appeal.

## II.  JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (F), and (H) and (c)(2).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUES

A.  Did the bankruptcy court err in amending the FAC according to proof on the breach of fiduciary claim under Civil Rules 15(b)(2) and 54(c)?

B.  Did the bankruptcy court err in finding that Paulson breached his fiduciary duties owing to Huerta and Falls through the merger of View with Lodge when Paulson complied with Nevada's merger statute?

C.  Did the bankruptcy court err in holding that Paulson breached his fiduciary duties owing to Go Global through the dissolution of MCD when Paulson complied with Nevada's dissolution statute?

D.  Did the bankruptcy court err in failing to hold a separate hearing to determine the amount of punitive damages against Appellants as required by Nevada law?

E.  Did the bankruptcy court err in failing to grant relief to Appellants with respect to the cabins?

F.  Did the bankruptcy court err in concluding that Appellants did not admit into evidence, or designate under Bankr. Local R. 7032, certain portions of the Daniel DeArmas

-24-

deposition testimony?

## IV. STANDARDS OF REVIEW

We review for abuse of discretion the bankruptcy court's decision to amend the FAC to include Appellees' state law claims under Civil Rule 15(b)(2) and grant Appellees' the relief to which they were entitled on those state law claims under Civil Rule 54(c). Carrol v. Funk, 222 F.2d 508, 511 (9th Cir. 1955) (Civil Rule 15(b)(2)); Albemarle Paper Co. v. Moody, 422 U.S. 405, 424-25 (1975) (the standard of review for application of Civil Rule 54(c) is "whether the [bankruptcy] court was clearly erroneous in its factual findings and whether it abused its traditional discretion to locate a just result in light of the circumstances peculiar to the case.").

The bankruptcy court abuses its discretion when it fails to identify and apply "the correct legal rule to the relief requested," United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc), or if its application of the correct legal standard was "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record,'" id. at 1262.

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.), 761 F.2d 1374, 1377 (9th Cir. 1985). Waiver is a question of law reviewed de novo. Schunck v. Santos (In re Santos), 112 B.R. 1001, 1004 (9th Cir. BAP 1990).

## V. DISCUSSION

**A. The Bankruptcy Court Did Not Abuse Its Discretion in Amending the FAC Under Civil Rule 15(b)(2) Or Granting Appellees' Relief To Which They Were Entitled Under Civil Rule 54(c)**

It is undisputed that Appellees did not allege any stand-alone Nevada state law claims in their FAC. Appellees first asserted their nonbankruptcy claims alleging Paulson's violation of Nevada's LLC statutes and breach of his fiduciary duties in their MSJ which was denied, and then again in their trial statement. These claims were also asserted in the district court action which was dismissed after Appellants consented to the bankruptcy court's jurisdiction to decide these claims. After trial, the bankruptcy court deemed the FAC amended under Civil Rules 15(b)(2) and 54(c) to include the state law claims for Paulson's violation of Nevada's LLC statutes and breach of his fiduciary duties to Appellees, finding that Paulson did not object to the evidence presented on those claims and suffered no prejudice.

Appellants contend that the bankruptcy court erred when it "created a cause of action for breach of fiduciary duty" on behalf of Appellees and awarded them over $5.5 million in consequential and punitive damages based on a claim that Appellees never pled. Appellants maintain the issues were not "extensively briefed" by either party and furthermore, they never consented to a trial of a "stand-alone claim for breach of fiduciary duty." The record shows to the contrary.

We first observe that Appellants consented to the bankruptcy court's entry of a final judgment. See 28 U.S.C.

-26-

§ 157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in non-core case). Because Appellees' breach of fiduciary claim against Paulson could exist independent of the bankruptcy, it was non-core. Accordingly, Appellants' consent was needed only because of the state court claim.

Second, Appellants concede that Paulson's breach of fiduciary duties was placed at issue in Appellees' trial brief, albeit in the context of Appellees' § 544(b)(1) claim. Section 544(b)(1) incorporates applicable state law and a breach of fiduciary duty claim could only be based on state law. As stated above, it is not a claim which has a separate existence in the bankruptcy code.[13] In connection with their breach of fiduciary duty argument in their trial statement, Appellees cited case law to demonstrate that Nevada imposed fiduciary duties between business partners. In addition, Appellees alleged that Paulson's intentional acts in divesting Appellees from their interests in the various entities constituted a clear breach of Paulson's fiduciary duties under Nevada law.

At trial, Paulson testified that he was familiar with what a fiduciary relationship was and also testified that as a

[13] The bankruptcy court found that Appellees had a direct cause of action against Paulson for breach of his fiduciary duties because that claim belonged to the debtor LLCs themselves. Therefore, technically § 544(b)(1) did not provide Appellees a vehicle for pursuing their breach of fiduciary duty claims. See In re Bliss Technologies, Inc., 307 B.R. 598, 608 (Bankr. E.D. Mich. 2004) (holding that § 544(b)(1) does not apply to claims of alleged breach of fiduciary duty). While Appellees may have mislabeled their claim, nowhere do Appellants challenge the bankruptcy court's factual findings regarding Paulson's breach of fiduciary duty.

-27-

member, he understood he had fiduciary responsibilities to co-members. Exhibits at trial included emails dated November 17, 23, and December 22, 2009,[14] in which Paulson acknowledged that he was sending information about a proposed offer to purchase the PCP property to "fulfill my fiduciary responsibility to the members of Pecan Street Plaza, LLC, as the Managing Member of PSP, LLC."

At the May 3, 2012 hearing for closing arguments, the bankruptcy court questioned Appellees' counsel regarding Paulson's fiduciary duties and to which entity they were owed. In their post-trial brief, Appellees again addressed Paulson's violations of his fiduciary duties and mentioned that such a breach was a separate tort upon which punitive damages could be based.

In light of Appellees' numerous references to Paulson's breach of fiduciary duties in their MSJ and trial statement, we conclude that Appellants had ample notice that the issue would be tried and they voiced no objection. Paulson's trial testimony regarding his knowledge of fiduciary duties and the bankruptcy court's questions to Appellees' counsel regarding Paulson's fiduciary duties demonstrate that the issue was indeed tried without complaint. Further, since a claim for breach of fiduciary duty can only be based on state law, it does not matter that a "stand-alone claim" for breach of fiduciary duty was not mentioned in the FAC.

---

[14] In the email dated December 22, 2009, Paulson made a capital call to pay taxes. Go Global's share would have been $21,424.50.

-28-

An amendment that seeks to conform the pleadings to proof introduced at trial is proper under Rule 15(b) unless it results in prejudice to one of the parties. See Mechmetals Corp. v. Telex Computer Prods., Inc., 709 F.2d 1287, 1294 (9th Cir. 1983). Similar to Civil Rule 15(b), the main qualification for granting relief under Civil Rule 54(c)[15] is that the failure to have demanded the appropriate relief must not have prejudiced the defendant in the defense of the matter. See 10 Wright, Miller & Kane, Fed. Prac. & Proc. Civ. § 2664 (3d ed. 2013); Hopkins v. D.L. Evans Bank (In re Fox Bean Co.), 287 B.R. 270, 281 (Bankr. D. Idaho 2002). In this context, prejudice would exist only if Appellants would have submitted additional evidence at trial not otherwise relevant to the issues actually raised. Id.; see also Rental Dev. Corp. v. Lavery, 304 F.2d 839, 842 (9th Cir. 1962) (prejudice has not been found to exist when the additional evidence would also have been relevant to the issues that were expressly raised).

Here, the bankruptcy court found no prejudice and we discern none. Appellants fail to show on appeal that they suffered any actual prejudice in the conduct of their litigation nor do they point to any additional evidence they would have submitted had Appellees asserted a stand-alone breach of fiduciary duty claim. Accordingly, we conclude that the

----

[15] Rule 54(c), incorporated by Rule 7054, provides, in pertinent part:

> Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party is entitled, even if the party has not demanded such relief in the party's pleadings.

-29-

bankruptcy court did not abuse its discretion by deeming the FAC amended under Civil Rule 15(b) to include the breach of fiduciary duty and other state law claims or by including those state law claims in its final judgment under Civil Rule 54(c).

**B.    NRS 86.286(6) Did Not Preclude A Finding That Paulson Was Liable for Breach of Fiduciary Duties As A Matter of Law**

Appellants next contend that, as a matter of law, no breach of fiduciary duty occurred pursuant to NRS 86.286(6) because the bankruptcy court found that Paulson's actions were taken in compliance with View's Operating Agreement and Nevada LLC statutory law.[16]  Appellants did not raise the applicability of NRS 86.286(6) in the bankruptcy court.  In general, we do not consider an issue raised for the first time on appeal.  <u>Cold Mountain v. Garber</u>, 375 F.3d 884, 891 (9th Cir. 2004).  However, we may exercise our discretion to consider the issue for the first time on appeal when the issue is purely one of law.  <u>Jovanovich v. United States</u>, 813 F.2d 1035, 1037 (9th Cir. 1987) (identifying the "narrow and discretionary exceptions to the general rule against considering issues for the first time on appeal").  Whether the statute precluded the bankruptcy court from finding Paulson liable for breach of fiduciary duties is an issue purely of law.  Therefore, we consider it.

In construing View's Operating Agreement, which Paulson conceded was ambiguous, the court stated, ". . . if Alternative Article X is deemed to be the controlling Article, Paulson <u>seems</u>

---

[16] Appellants do not contend on appeal that Paulson owed no fiduciary duties to Appellees.  In fact, Paulson admitted that he owed such duties at trial.

-30-

to be acting within the operating agreement provisions." The court further found that under Nevada law, Paulson was authorized under the "default rule" as the controlling member of View and default manager to have caused the merger. Finally, the bankruptcy court found that Appellees did not have a claim under Nevada's statute governing LLC merger because under NRS 92A.150, only a member holding a majority interest in an LLC may effect a merger of that entity.

Because of these rulings, Appellants contend that Paulson is entitled to rely on NRS 86.286(6), which protects managers and members of Nevada limited liability companies who rely in good faith on LLC operating agreements from claims for breach of fiduciary duty. The statute provides:

> Unless otherwise provided in an operating agreement, a member or manager or other person is not liable to a limited-liability company, another member or manager, or to another person that is a party to or otherwise bound by an operating agreement for breach of fiduciary duty for the member, manager or other person's good faith reliance on the provisions of the operating agreement.

While it is true that generally a member of an LLC is not liable to the LLC or any other member for actions taken in compliance with the operating agreement, NRS 86.286(6) also requires that the member must have relied on the provisions in good faith. Appellants overlook this requirement. We have difficulty perceiving how Paulson could rely on the ambiguous provisions in the operating agreement in good faith.[17]

---

[17] As the bankruptcy court observed inequitable action does not become permissible simply because it is legally possible.
(continued...)

-31-

Furthermore, under Nevada law, a fiduciary relationship imposes a duty of utmost good faith. Hoopes v. Hammargren, 725 P.2d 238, 242 (Nev. 1986). Common sense dictates that good faith reliance on an operating agreement's provisions must mean reliance that is honest as opposed to dishonest. Indeed, the bankruptcy court recognized the good faith requirement underlying Paulson's fiduciary duties and found that "Paulson's actions do not measure up."

In addition, the court found that "Paulson could have used his majority holdings to ultimately cause a merger of View, however, if he did, Paulson owed Falls and Huerta the duty of proceeding fairly, both procedurally and substantively." The court found "[h]e did neither, proceeding in secret and offering a price for Falls' interest in View that was risible. Throughout . . . he acted as if these standard [fiduciary] duties did not apply to him, and as if his majority ownership and his position as manager gave him carte blanche to do as he pleased."

In awarding punitive damages, the bankruptcy court found "Paulson's perfidy was malicious . . . he intended to injure Huerta and his affiliates . . . specifically designed to deprive Huerta of his property without giving Huerta any realistic opportunity to defend. Such conduct was also oppressive . . . [i]t was 'despicable', in that it knowingly subjected Huerta to unjust financial hardship, and was a contributing cause to

---

[17](...continued)
Schnell v. Chris-Craft Indus., Inc., 285 A.2d 437, 439 (Del. 1971).

-32-

Huerta's bankruptcy filing." In the end, the court found "[t]hat anyone who would act with such blatant disregard of his core duties of loyalty and good faith fits any standard definition of 'despicable.'" Taken together, these findings demonstrate that Paulson did not rely on View's Operating Agreement in good faith when he undertook the merger. Accordingly, Appellants' reliance on NRS 86.286(6) as a basis for reversal is misplaced.

**C.  The Bankruptcy Court Did Not Err When It Found Paulson Breached His Fiduciary Duties Owing To Go Global**

Appellants next argue that the bankruptcy court erred when it found Paulson breached fiduciary duties owing to Go Global when he dissolved MCD. Again, Appellants do not contend that they did not owe Go Global fiduciary duties; rather, they assert that Paulson did not breach those duties because he complied with NRS 86.490(1). Specifically, at the time of the dissolution, Paulson held 40% interest and both Barnes and Go Global held 30%. Appellants contend that the evidence shows that Barnes participated in the dissolution and signed the dissolution papers. Therefore, Appellants argue, Paulson and Barnes with 70% interest were authorized under NRS 86.490(1) to dissolve the entity.

The statute provides:

1. Before the commencement of business by any limited-liability company where management is vested in one or more managers and where no member's interest in the limited-liability company has been issued, at least two-thirds of the organizers or the managers of the limited-liability company may dissolve the limited-liability company by filing with the Secretary of State a certificate of dissolution to dissolve the limited-liability company.

-33-

Again, Paulson's alleged compliance with this statute does not mean that his dissolution of MCD was proper because his fiduciary duties to a minority member, Go Global, existed concurrently with the statutory requirements. See Coggins v. New England Patriots Football Club, Inc., 492 N.E.2d 1112, 1117-18 (Mass. 1986) ("A showing of compliance with statutory procedures is an insufficient substitute for the inquiry of the courts when a minority shareholder claims that the corporate action will be illegal or fraudulent as to him.").

At trial, Paulson testified that he did not instruct Barnes to dissolve MCD. Paulson's testimony also revealed that once he informed Barnes that he did not want to do business with Huerta, Barnes suggested that they dissolve the MCD. Finally, Paulson testified that he did not talk to Huerta in August 2009 and say that he would like to dissolve MCD because the parties were in other litigation over Waterstone and due to other business problems with View and Gaming.

In its FFCL, the bankruptcy court found that Paulson had wrongfully dissolved MCD as part of his squeeze-out scheme and to divest Go Global of its interest in MCD without notice or consent. By implication, this finding shows the bankruptcy court found Paulson's testimony disingenuous. Therefore, we cannot conclude that the bankruptcy court's findings were clearly erroneous when they are based on a plausible view of the evidence as a whole. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985). Further, the bankruptcy court

-34-

indicated that it would consider matters from the Waterstone Action, including the credibility of the parties and witnesses. To the extent the bankruptcy court's findings were based on credibility determinations, the court's findings warrant even greater deference. Id. at 575. Accordingly, Appellants' reliance on NRS 86.490(1) as a basis for reversal is misplaced.

**D. The Bankruptcy Court Did Not Err When It Failed to Hold a Second Hearing on Punitive Damages**

Appellants next complain that the bankruptcy court erred by failing to heed the mandatory language under NRS 42.005(3), which required the court to conduct a subsequent hearing on the amount of the damages after it determined that punitive damages would be assessed. In its ruling, the bankruptcy court acknowledged that NRS 42.005(3) contemplated a two-step process, but found that "all parties waived the benefit of this section."

NRS 42.005 provides:

1. Except as otherwise provided in NRS 42.007, in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant. Except as otherwise provided in this section or by specific statute, an award of exemplary or punitive damages made pursuant to this section may not exceed:

> (a) Three times the amount of compensatory damages awarded to the plaintiff if the amount of compensatory damages is $100,000 or more; or

> (b) Three hundred thousand dollars if the amount of compensatory damages awarded to the plaintiff is less than $100,000.

2. The limitations on the amount of an award of exemplary or punitive damages prescribed in

-35-

subsection 1 do not apply to an action brought against:

    (a) A manufacturer, distributor or seller of a defective product;

    (b) An insurer who acts in bad faith regarding its obligations to provide insurance coverage;

    (c) A person for violating a state or federal law prohibiting discriminatory housing practices, if the law provides for a remedy of exemplary or punitive damages in excess of the limitations prescribed in subsection 1;

    (d) A person for damages or an injury caused by the emission, disposal or spilling of a toxic, radioactive or hazardous material or waste; or

    (e) A person for defamation.

3. If punitive damages are claimed pursuant to this section, the trier of fact shall make a finding of whether such damages will be assessed. If such damages are to be assessed, a subsequent proceeding must be conducted before the same trier of fact to determine the amount of such damages to be assessed. . . .

4. Evidence of the financial condition of the defendant is not admissible for the purpose of determining the amount of punitive damages to be assessed until the commencement of the subsequent proceeding to determine the amount of exemplary or punitive damages to be assessed.

On its face, subsection 4 is a codification of the presumption that evidence of a defendant's wealth can taint a determination of liability. Thus, the purpose of the second hearing requirement under subsection 3 is to avoid this prejudice.

Under subsection 3, the use of the word "must" in the phrase "subsequent hearing must be conducted . . . to determine the amount. . . ." implies that the second hearing requirement

-36-

is mandatory. However, the mandatory effect of subsection 3, like many other rights, may be lost by a defendant who fails to act promptly to preserve its protection. A waiver of one's rights can be implied by that person's conduct. Mahban v. MGM Grand Hotels, 691 P.2d 421, 423 (Nev. 1984).

From at least March 9, 2012, Appellants had notice that Appellees were seeking punitive damages and that they were relying on NRS 42.005, among other authorities, because Appellees mentioned the statute in their Bench Brief on consequential and punitive damages. Appellees' post-trial brief incorporated their pre-trial brief on punitive damages. However, Appellants never raised their statutory right to a second hearing in the bankruptcy court and have offered no excuse for their delay in raising the deficiency for the first time on appeal.[18] Therefore, we conclude that Appellants' right to a second hearing is untimely asserted.

Moreover, there is no Nevada authority holding that a defendant's financial condition is an essential element to prove entitlement to punitive damages. Instead, NRS 42.005(1) sets forth the requirements for assessing punitive damages and also places limitations on the amount subject to certain exceptions. These limitations, which applied to Paulson, are tied to the amount of compensatory damages and not to a defendant's

---

[18] Indeed, the bankruptcy court noted that Appellants' post-trial brief incorrectly stated that Huerta was not relying on NRS 42.005.

-37-

financial condition.[19] It is therefore not surprising that Appellants make no offer of proof regarding the prejudice Paulson suffered without the benefit of a second hearing nor do they point to any specific evidence admitted at trial about Paulson's financial condition that made the procedure unfair. Under these circumstances, the bankruptcy court's failure to hold a second hearing on the amount of the punitive damages does not amount to reversible error.[20]

**E.    The Bankruptcy Court Did Not Err When It Refused to Quiet Title to the Cabins In Favor Of Defendants**

In their counterclaim, Appellants sought declaratory and injunctive relief with respect to ten cabins located on the Property. In addressing the counterclaim in the FFCL, the bankruptcy court found that "[g]iven that Paulson did not prevail on his substantive claims, there is no plausible rationale for quieting title in any of Paulson's entities, and thus that claim for relief is denied. No opinion is expressed on the title to, or the legal or beneficial interest in, the cabins at issue."

On appeal, Appellants assert that the bankruptcy court's

---

[19] In contrast, the limitations set forth in NRS 42.005(1)(a) and (b) do not apply to certain types of actions specified in NRS 42.005(2)(a)-(e).

[20] Appellees argue that NRS 42.005(3) is inapplicable to the adversary proceeding and cite nonbinding case law from Oregon in support, <u>DeMendoza v. Huffman</u>, 51 P.3d 1232 (Or. 2002). It is unnecessary for us to delve into whether Civil Rule 42(b), rather than NRS 42.005(3), should apply to the bifurcation issue when the bankruptcy court specifically relied upon NRS 42.005(3) in its ruling and found that the parties had waived the second hearing requirement.

denial of their declaratory relief claim was in error because under NRS 92A.250(1)(b), Lodge took title to the cabins from View upon the execution of the merger. Under this statute, entitled "When a Merger Takes Effect," a merger takes effect when the title to all real estate and other property owned by each merging constituent entity is vested in the surviving entity without reversion or impairment. In other words, the surviving corporation assumes the liabilities and assets of the subsumed corporations as a matter of law when the merger is completed. Among other things, this obviates the necessity of creating a separate instrument reflecting the change in ownership of each such liability and asset. According to Appellants, the bankruptcy court found Paulson caused the merger of View with Lodge consistent with Nevada law and such a finding triggered this statute. We are not persuaded.

NRS 40.010 governs Nevada quiet title actions and provides: "An action may be brought by any person against another who claims an estate or interest in real property, adverse to the person bringing the action, for the purpose of determining such adverse claim." Under Nevada law, a plea to quiet title does not require any particular elements, but "each party must plead and prove his or her own claim to the property in question" and a "plaintiff's right to relief therefore depends on superiority of title." Chapman v. Deutsche Bank Nat'l Trust Co. (Chapman II), 302 P.3d 1103, 1107 (Nev. 2013). Moreover, such an action requests a judicial determination of all adverse claims to disputed property. Clay v. Scheeline Banking & Trust Co., 159 P. 1081, 1082-83 (Nev. 1916).

-39-

In their counterclaim, Appellants assert superior title to the cabins based on a valid merger of View into Lodge. However, the record is replete with evidence that the merger was accomplished by Paulson's wrongful conduct. Thus, we fail to see how equitable title to the cabins would have passed to Lodge after the merger.[21]

Further, the unchallenged testimony of Huerta was that the deeds from the straw men to View were unrecorded at the time of the merger. At trial, Huerta testified that he purchased nine cabins and that the ownership rights were in View. He also testified that the cabins were held by straw men who were individuals and not by View. Finally, Huerta testified that he obtained quitclaim deeds from most of the straw men, but not all of them, and that none of the quitclaim deeds had been recorded. Therefore, because View was not the title record holder, legal title would not have transferred to Lodge as a result of the merger. In short, Appellants did not prove their claim to the cabins based on a valid merger nor did they show they had superior title.[22] Accordingly, the bankruptcy court did not err by denying Appellants' quiet title claim.

The bankruptcy court did not decide the title to, or the

---

[21] The bankruptcy court found that the requirements for a constructive or resulting trust were not met.

[22] On appeal, Appellants do not challenge the bankruptcy court's factual findings related to Paulson's breach of fiduciary duties. Moreover, as previously noted, Paulson's alleged compliance with the merger statute does not trump inequitable conduct. See Schnell, 285 A.2d at 439; Coggins, 492 N.E.2d at 1117-18.

-40-

legal or beneficial interest in, the cabins. Because we are a reviewing court, we decline to decide these issues for the first time on appeal.

**F.    The Bankruptcy Court Did Not Err When It Failed to Credit Daniel DeArmas' Deposition Testimony**

Paulson relied upon a portion of DeArmas' deposition to corroborate his concerns regarding Huerta's business ethics which led Paulson to disassociate himself from Huerta and also to show that the one million dollar payment in the C-Bar/Huerta transaction that ultimately went to Go Global was an effort on Huerta's part to artificially boost his basis in the Mt. Charleston property. On the latter point, Paulson argued that the one million dollars should be netted out against the three million dollars in consideration, with the ultimate conclusion that Huerta at most invested two million, not three million, in the Property.

The bankruptcy court found that Paulson had failed to designate this testimony in his Bankr. Local Rule 7032 Statement or, if he had, he did not enter it into evidence at trial. The court further found that the parties did not stipulate to admit this portion of the deposition. Nonetheless, the court stated that "this fact can be inferred from the testimony at trial."

Paulson contends that he clearly designated relevant portions of the DeArmas testimony in his Local Rule 7032 Statement on March 9, 2012, and that the parties stipulated to admission of the deposition transcript for the court to review, rather than reading them into the record. The record supports Paulson's assertion. Regardless, the trial court incorporated

-41-

Appellants' arguments that relied on the testimony in its ruling, assuming the testimony to be in evidence. Accordingly, the asserted error is harmless and not a ground for reversal.

## VI. CONCLUSION

For all these reasons, we AFFIRM.